[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-14198

Non-Argument Calendar

_____

DWIGHT PRUDE,

　　　　　　　　　　　　　　　　　　Plaintiff-Appellant,

*versus*

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

　　　　　　　　　　　　　　　　　　Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-62099-DPG

_____

Before JORDAN, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

This social security appeal requires us to determine whether substantial evidence supports the Social Security Commissioner's denial of Dwight Prude's request for benefits. The district court affirmed the Commissioner's denial. Prude argues that the administrative law judge performed a materially deficient residual functional capacity analysis by making two errors: first, the ALJ did not consider time off to attend medical appointments, and second, the ALJ did not address his mental impairments. Prude also argues that the ALJ erred in determining that he could perform light exertional work despite his vision and back problems. After careful review of these arguments, we affirm the Commissioner's denial of benefits.

## I.

Because Prude challenges the ALJ's application of the five-step framework for determining disability benefits, we start by summarizing the regulation establishing that framework. Then we turn to the specific facts and ALJ determination that Prude appeals.

To determine whether a claimant is disabled and entitled to benefits, an ALJ uses a five-step evaluation process. 20 C.F.R. § 404.1520. If the ALJ finds the claimant is not disabled after one of the sequential steps, the analysis ends.

At the first step, the ALJ considers the claimant's current work activity, or "substantial gainful activity." *Id.*

§ 404.1520(a)(4)(i). Second and relevant here, the ALJ considers the "medical severity" of an impairment. *Id.* § 404.1520(a)(4)(ii). If the claimant does not have a severe mental or physical impairment that meets the durational requirements in section 404.1509, he is not disabled, and the process ends. *Id.* That "duration[al] requirement" states that the impairment must be "expected to result in death" or has lasted or is expected to "last for a continuous period of at least 12 months." *Id.* § 404.1509.

In assessing the claimant's mental impairments, the ALJ follows specific guidelines to determine a claimant's functional limitations. Those guidelines, assessing "four broad functional areas," include the claimant's ability to (1) "[u]nderstand, remember, or apply information;" (2) "interact with others;" (3) "concentrate, persist, or maintain pace;" and (4) "adapt or manage oneself." *Id.* § 404.1520a(c)(3). The ALJ rates these four functional areas on a five-point scale: "None, mild, moderate, marked, and extreme." *Id.* § 404.1520a(c)(4). A rating of mild or below is generally considered not severe. *Id.* § 404.1520a(d)(1). In any case, if the claimant shows a severe physical or mental impairment, the ALJ continues to step three.

At the third step, the ALJ considers the medical severity of the impairment to determine whether the claimant's impairment is listed in the regulation's appendix. *Id.* § 404.1520(a)(4)(iii). If the claimant has a listed-level impairment, he is considered disabled. Otherwise, the ALJ continues to the next step.

The fourth step, relevant here, requires assessing the claimant's "residual functional capacity," considering "past relevant work." *Id.* § 404.1520(a)(4)(iv). If the claimant can still perform his old job, he is not considered disabled.

Finally, the fifth step considers the claimant's residual functional capacity and his "age, education, and work experience." *Id.* § 404.1520(a)(4)(v). These considerations determine whether the claimant can adjust to "other work." *Id.* And if so, he is not considered disabled. *Id.*

Turning to this case, Dwight Prude worked as a firefighter until he retired in 2017 at age fifty-three. Between retiring and filing his claim, Prude also worked part-time as a referee for high school sports. Three years after his retirement, he applied for benefits under Title II of the Social Security Act, claiming a disability date of January 2017. In his request, he alleged back, vision, sleep, headache, and mental health problems.

Prude sought medical treatment for his back pain beginning in April 2020, three years after his claimed disability, from Dr. Berkower. Upon seeking treatment, Prude noted that he had experienced backpain for the past fifteen years, including when he worked as a firefighter. As part of Dr. Berkower's examination, he described Prude as "very active," noting that he walked daily, did yoga every other day, and refereed sports games. Around this time, Prude also began physical therapy. Later, Prude underwent spinal surgery, with the operating surgeon reporting that his hardware was in an "excellent" position.

Along with receiving care for his physical health, Prude sought treatment for his mental health. He visited Dr. Poitier's office around a dozen times from March 2020 to November 2021. Some meetings occurred online, others on weekends, and they often lasted up to twenty minutes. In most of the visit evaluations, Dr. Poitier noted that Prude seemed in good spirits without psychiatric problems. These reports also indicate that Dr. Poitier diagnosed Prude with post-traumatic stress disorder and prescribed medication for that condition. One report in August 2020 indicates that Prude suffered anxiety, but later reports noted that he showed no signs of that condition.

Besides these appointments, other medical personnel performed consultive exams of Prude. Among these exams, Dr. Fernandez observed that Prude's vision was intact, his judgment and memory were preserved, and he had the ability to perform activities like lifting and moving about.

Two state agency consultants also reviewed Prude's file for mental impairments. Doctors Maki and Weber determined that Prude's post-traumatic stress disorder was non-severe. And then two additional consultants assessed his physical impairments, finding that he had no visual limitations and noting that Prude could still perform "medium" work.

After the initial denial of his claims, Prude requested a hearing before an ALJ. At the hearing, Prude and a vocational expert testified. During his testimony, Prude explained that he stopped

working because of his post-traumatic stress disorder and problems with functional tasks, such as lifting, walking, and standing.

To determine Prude's eligibility for disability benefits, the ALJ analyzed Prude's claim using the five-step framework. 20 C.F.R. § 404.1520(a)(4). Under step one, the ALJ found that Prude was not engaged in substantial gainful activity since January 31, 2017, his alleged onset date. Then under step two, the ALJ determined that Prude has a "severe" impairment because of his disorder of the lumbar spine. As part of that step, the ALJ also determined that Prude's post-traumatic stress disorder mental impairment was "mild," and therefore non-severe. The ALJ based that determination on the analysis of the "paragraph B" criteria, finding that Prude's disorder impacted his ability to interact with others and concentrate, persist, and maintain pace. After noting that the paragraph B functional criteria "are not a residual functional capacity assessment[,]" the ALJ explained the persuasive value of two medical opinions. The ALJ determined that Doctors Maki and Weber's opinions were consistent with the record and Prude's mental health treatment, and as such, the ALJ considered those opinions persuasive.

Next, under step three, the ALJ did not find an impairment listed in Appendix I of the regulation. Proceeding to the next steps, which require the residual functional capacity determination, the ALJ relied on, among other evidence, the medical opinions of Doctors Fernandez and Scanameo. Relevant to the ALJ's physical impairment analysis, Dr. Fernandez, who completed a consultive

examination of Prude, noted that Prude exhibited normal strength and motion in his extremities. Dr. Fernandez further noted that Prude had the ability to hear and understand normal conversational speech. Along with these observations, the ALJ determined that Prude's testimony was inconsistent with the medical opinions that Prude could perform light work activity.

The ALJ considered the vocational expert's testimony that Prude could perform occupations such as a fire assistant, fire inspector, cleaner/house, and cashier. The vocational expert identified about 800,000 positions available that Prude could perform. Because of these findings, the ALJ determined that Prude was not disabled, as defined by the Social Security Act.

Prude challenged the ALJ's decision, but the Appeals Council denied his request for review and affirmed the ALJ's determination. Therefore, the ALJ's determination became the final decision of the Commissioner. Prude then sought review of the Commissioner's decision by the district court. A magistrate judge issued a report and recommendation to affirm the Commissioner's decision, and the district court adopted that recommendation in its entirety.

## II.

On appeal, we determine whether the Commissioner based a decision for disability benefits on substantial evidence and applied the proper legal standards. *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1268 (11th Cir. 2024). For the substantial evidence standard, we must find enough evidence that "a reasonable person would

accept as adequate to support a conclusion." *Id.* at 1269 (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)). But this review is limited. We will not decide facts "anew" or substitute our judgment for that of the Commissioner. *Id.* And our review of the district court is *de novo*. *Id.*

### III.

Prude makes four arguments on appeal. First, he argues that the ALJ's residual functional capacity finding is "materially deficient" because it fails to consider the impact of his potential absences from work. Second, he argues that the finding is deficient because the ALJ failed to consider his mental impairments as part of the residual functional capacity analysis. Third, he argues that the ALJ failed to consider his vision-related impairments. And fourth, he argues that the ALJ exaggerated his ability to perform light work. We address each argument in turn.

First, Prude argues that the administrative judge failed to consider "absenteeism," meaning the number of absences from a job because of doctor appointments, or time off from tasks. To support this contention, he states that between March 7, 2020, and January 6, 2022, he visited a health professional on at least seventy days, averaging 3.18 visits per month. Relevant to this argument, during Prude's hearing before the ALJ, the vocational expert observed that an employee who is absent ten percent of the time, or misses one day a month, will not be able to maintain employment. The vocational expert also stated that employees generally have work breaks, ranging from thirty minutes to an hour. Because the

ALJ asked these questions, Prude argues that the ALJ considered the effect of absenteeism on his functional limitations, and therefore, it should be part of his residual functional capacity determination.

The burden to present evidence proving a disability is on the claimant. *Barnhart*, 405 F.3d at 1211. To support this argument, Prude points us to the number of doctor appointments in the record. But Prude conflates the number of appointments with the number of days required to take off for such appointments. Based on the number of appointments, Prude's argument assumes that each appointment equaled one day off from work for "a minimum occurrence rate of 3.18 times every 30 days." This argument requires us to assume facts that are absent from the record. Prude did not demonstrate that doctors only offered these appointments during working hours, or that these appointments would last the entire workday. Instead, the record shows the opposite. He often scheduled appointments on the weekends or in the evenings. Further, Prude's appointments typically lasted less than an hour, indicating that he could attend his appointments without missing a workday. Without this evidence in the record, the ALJ's determination cannot be viewed as materially deficient. Because Prude cannot demonstrate that medical appointments impact his ability to work with record evidence—despite his burden to do so—we find the ALJ did not err by excluding absences as part of the analysis.

Second, Prude contends that the ALJ failed to include his mental limitations in the residual functional capacity determination. He argues that steps four and five require considering all impairments—including mental—to determine the residual functional capacity. And that statement is correct: the ALJ "must [] consider a claimant's medical condition taken as a whole" assessing "all impairments, severe and non-severe." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1268–69 (11th Cir. 2019). To support his argument, he directs us to Dr. Poitier's notes that he demonstrated signs of depression and anxiety. And he relies on his testimony about his post-traumatic stress disorder, which he alleges impacts his sleep, memory, concentration, and ability to hold a schedule.

Prude argues that this court's decision in *Schink* proves his point. In *Schink*, the claimant alleged and presented evidence of his bipolar disorder, but the ALJ considered his mental impairment non-severe at step two. 935 F.3d at 1267–68. Then, in assessing the claimant's residual functional capacity, the ALJ did not include an analysis of mental capacities or limitations. *Id.* at 1269. This Court determined that the ALJ erred by discounting the medical opinions of the claimant's treating physicians regarding mental impairments. *Id.* at 1260. The record did not support the ALJ's conclusion that the claimant's mental examinations revealed a mild impairment at step two. *Id.* at 1268. And relevant here, we determined that "the ALJ's ultimate conclusions as to RFC do not include even a single finding about [the claimant's] mental capacities" focusing "exclusively" on the claimant's "physical capacities." *Id.* at 1269 (emphasis added). Prude also relies on an unpublished opinion for

his argument that the ALJ's residual functional capacity analysis failed to address his mental impairment. In *Arce v. Comm'r of Soc. Sec.*, as in *Schink*, the ALJ did not address the claimant's mental capabilities in determining the residual functional capacity and only relied on the four-functional "paragraph B" criteria in assessing those capabilities. No. 23-11315, 2024 WL 36061, at *2 (11th Cir. Jan. 3, 2024).

Prude's determination is distinguishable from the claimants in *Schink* and *Arce*. Here, the ALJ considered, in the residual functional capacity analysis, the fact that the "claimant has the ability to hear and understand normal conversational speech," and "can do work-related mental activities involving common understanding and memory; sustain concentration and persistence; social interaction and adaptation." Although the ALJ's acknowledgment of his mental impairments is brief, we find it sufficient because it explicitly acknowledges the claimant's mental capabilities relevant to a job. We also note that substantial evidence supports the ALJ's determination of a non-severe mental impairment at step two—and Prude does not argue otherwise. By contrast, in *Schink* we determined that the ALJ erred at both steps two and four by discounting medical testimony of mental impairments despite evidence showing a bipolar disorder. *Schink*, 935 F.3d at 1268, 1269–70.

Further, we recently rejected an argument that would require a duplicative analysis at each step of the evaluation process. In *Raper*, we determined that the best way to read the ALJ's decision is "as a whole" because "it would be a needless formality to

have the ALJ repeat substantially similar factual analyses[.]" 89 F.4th at 1275 (citing *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004)). Here, reading the entire determination, the ALJ considered record evidence, consisting of medical opinions, that indicate Prude's mental impairments did not limit his ability to interact with others, understand information, concentrate, or manage himself. In step two, following the "paragraph B" analysis, the ALJ relied on and noted the opinions of Doctors Maki and Weber. The decision—as a whole—indicates that the ALJ considered Prude's mental impairments in determining his residual functional capacity.

And one last point to this argument: the medical evidence Prude relies on supports the ALJ's decision. In March 2020, Dr. Poitier reported Prude as "friendly'" but "tense" without signs of depression or mood elevation. A month later, Dr. Poitier observed that Prude appeared "friendly" and "attentive" presenting a "normal" mood without "signs of either depression or mood elevation." And again, in June 2020, Dr. Poitier made the same observation relating to a normal mood and no signs of depression. The record includes similar observations for June 2020, but two months later, a report, in August 2020, notes signs of anxiety. One month later however, in September 2020, Dr. Poitier observed no signs of depression. Dr. Poitier made similar observations in February 2021, March 2021, and May 2021 that he did not observe signs of depression or illogical thinking. Based on our reviewing standard, we cannot say the record compels us to reach a different decision than the ALJ.

Lastly, Prude argues that the ALJ failed to consider his visual impairments and additional physical limitations impacting his ability to perform light exertional work. Because the standard of review compels this decision, we reiterate that the substantial evidence threshold "is not high" and "defers" to the ALJ's findings. *Biestek v. Berryhill*, 587 U.S. 97, 103, 108 (2019). Relevant here, Doctors Gerrish and Scanameo determined that Prude did not have a visual limitation. And the ALJ considered, among other things, evidence of Prude's active lifestyle, including yoga, caring for his animals, and refereeing sports, and medical opinions regarding his functional movement abilities. Thus, substantial evidence supports the ALJ's determination that Prude can perform light exertional activity.

## IV.

For these reasons, we **AFFIRM** the district court.